Filed 1/30/14  In re N.H. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re N.H. et al., Persons Coming Under the Juvenile Court Law. | C074457 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.H. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. JD231938 & JD232194) |

A.H., the mother of four-year-old N.H. and one-year-old I.H., appeals from a juvenile court order denying her request to change court order pursuant to Welfare and Institutions Code section 388 (388 petition), and also appeals from an order terminating her parental rights.  In addition, D.J., the biological father of I.H., appeals from an order

1

terminating his parental rights. (Welf. & Inst. Code, §§ 366.26, 388, 395.)[1] E.G., the alleged father of N.H. and the uncle of D.J., is not a party to this appeal.

As a threshold matter, respondent Sacramento County Department of Health and Human Services (Department) contends A.H. (mother) and D.J. (father) failed to appeal the order denying their 388 petition, because they did not check the pertinent box on the notice of appeal. We conclude, however, that because mother and father submitted a letter with their notices of appeal providing additional information, and notices of appeal are entitled to liberal construction in favor of sufficiency, the letter and notices of appeal are sufficient.

Turning to the contentions of mother and father, mother contends the juvenile court abused its discretion in denying her 388 petition. Father joins mother's arguments, arguing that if mother is successful, the order against father must be reversed too. Finding no abuse of discretion, we will affirm the juvenile court orders.[2]

## BACKGROUND

We do not set forth the background related to father because his claim on appeal arises from the juvenile court ruling on mother's 388 petition.

### A

Mother's first child, No.H., was born in August 1998. Six months later, the Department received a referral alleging general and severe neglect of No.H. The reporting party described mother as a " 'poor historian' " who could not remember when

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The Department notes that, in the juvenile court, mother's counsel expressed the intent to argue the applicability of the beneficial relationship exception to termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) Later, in her summation, mother's counsel briefly asked the juvenile court to apply the exception. But mother's appellate briefs do not assert any claim of error regarding the beneficial relationship exception, and thus we will not consider that issue. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

No.H. had last eaten or last had an asthma attack. The next month, the Department received another referral alleging that mother "does not appear to know how to determine if [No.H.] is sick."

In November 2001, the maternal grandmother was appointed legal guardian of No.H.

In a November 2011 interview, mother stated, " 'I can't take care of [No.H.] now. He's set in his ways and has been with my mom since he was really little.' " At the time, mother was visiting No.H. approximately once per month.

B

While pregnant with her second child, N.H., mother tested positive for amphetamines during prenatal care appointments in September 2009 and December 2009. Before N.H. was born, mother had a felony burglary conviction and misdemeanor convictions for grand theft, theft of personal property, driving and theft of a vehicle, possession of a hypodermic needle and syringe, and possession of narcotics paraphernalia. Mother claimed she had not had any arrests or convictions since 2006.

N.H. was born in January 2010 at 34 weeks gestation. She weighed five pounds nine ounces at birth, and was transferred to neonatal intensive care due to respiratory distress. Mother exhibited manic symptoms at the hospital. That same month, allegations of general neglect were substantiated, allegations of severe neglect were found to be inconclusive, and mother agreed to voluntary informal supervision services. Mother's case plan included parenting education, outpatient substance abuse treatment, substance abuse testing, a 12-step program, and early intervention drug court.

Upon N.H.'s release from the hospital in late January 2010, the Department put N.H. in an emergency placement because mother had not done any substance abuse testing or met with her recovery specialist, and because her mental health issues had not stabilized.

In February 2010, mother tested positive for methamphetamine and showed visible signs of active use. She agreed to enter residential substance abuse treatment. In June 2010, N.H. was returned to mother's care at the treatment facility. In July 2010, mother completed residential treatment and moved into transitional housing.

In October 2010, mother was discharged from early intervention drug court for failure to comply; she missed some scheduled group treatment sessions. In December 2010, mother was discharged from transitional housing because she violated curfew by staying out all night.

From December 2010 through October 24, 2011, the Sacramento County Sheriff's Department received 15 calls dispatched for mother's address. Mother's probation expired in August 2011.

In a domestic violence incident on October 3, 2011, father injured his arm while punching a window and mother pepper sprayed father. In another domestic violence incident on October 16, 2011, mother had bruising on her arm and a small puncture wound. Father had a large cut on his hand and received emergency room treatment. N.H. was 10 to 15 feet away from the altercation. Mother declined to pursue charges and was not fearful of future violence.

On October 20, 2011, N.H. was removed from mother's care and placed in protective custody. At that time, mother was pregnant with I.H. and she was unwilling to pursue a restraining order against father or force him to leave the home.

On October 24, 2011, a petition was filed alleging a substantial risk that N.H. would suffer serious physical harm or illness because the parents engaged in domestic violence in her presence. Mother failed to protect N.H.; she was unwilling to seek or enforce a restraining order against father. On October 25, 2011, the juvenile court ordered N.H. detained.

In a November 2011 interview for the jurisdiction report, mother told a social worker, " 'I want to get my daughter back. I will do whatever it takes. I will go over and

4

beyond.' " Mother said she last used methamphetamine in 2009. She said she first consumed alcohol at age 11 and had last done so four years before the November 2011 interview. Mother stopped drinking because she " 'didn't want to end up like [her] dad.' " Mother had been diagnosed with bipolar disorder and depression and had taken medication until she became pregnant with I.H.

In November 2011, mother entered a waiver of her rights. The juvenile court sustained the petition, adjudged N.H. a dependent of the court, removed her from mother's custody, and ordered reunification services for mother.

C

In February 2012, I.H. was born five weeks premature. Both I.H. and mother tested positive for amphetamine and methamphetamine. After the birth, mother became agitated, denied substance abuse, denied knowing who had fathered I.H., began removing her intravenous tubes, and threatened to leave the hospital without medical clearance. I.H. was placed in neonatal intensive care for his safety and the treating nurse advised the Department to have security present during any interview with mother.

On February 21, 2012, a petition was filed alleging a substantial risk that I.H. would suffer serious physical harm or illness because mother failed or refused to rehabilitate from substance abuse, and that mother had not engaged in domestic violence services or counseling following the loss of custody of N.H.

At the February 22, 2012, initial hearing for I.H., the juvenile court prohibited mother from breastfeeding him unless authorized to do so by a physician aware of mother's drug history and unless mother established a pattern of clean tests. The juvenile court found father to be an alleged father of I.H. I.H. was ordered detained and mother was awarded visitation.

The jurisdiction report for I.H. noted that mother had been assessed for use of alcohol and drugs. Mother said methamphetamine was her drug of choice. She first used it at age 14 and has eaten, injected, and smoked it. She stopped using the drug in

5

January 2010 but then relapsed three times between December 2011 and February 2012. Her most recent use was one week prior to the assessment. Mother related that she had tried other drugs one to three times each. She first used alcohol at age 14 and last used it at age 17. Mother was offered residential drug treatment but expressed a preference for intensive outpatient treatment.

On February 27, 2012, mother cancelled a visit with I.H. because she had become ill.

On March 7, 2012, I.H.'s foster mother indicated that I.H. had "a leaky mouth" with "poor suck" and that he "screams and cries a lot, and experiences tremors." He was drinking infant formula every two hours. The doctor told the foster mother that I.H. was at high risk for sudden infant death due to exposure to drugs during gestation.

Between March 5 and 9, 2012, the Department scheduled three different interview appointments for mother. She did not appear for the first appointment, rescheduled the second appointment, and did not appear for the third appointment. On March 12, 2012, mother cancelled a visit with I.H. because she had been evicted from her residence. Between March 15 and 19, 2012, I.H. was hospitalized with various ailments. A neglect allegation against his caretaker was substantiated and his placement was changed.

On March 22, 2012, mother did not attend a prejurisdictional status conference for I.H. The juvenile court ordered mother's appearance at the continued hearing the next month. On April 20, 2012, mother entered a waiver of her rights. The juvenile court sustained the petition, adjudged I.H. its dependent, and ordered mother into dependency drug court.

D

The six-month review report for N.H. noted that N.H. initially had difficulty adjusting to placement; she played alone, bit other children, pulled out her hair, and had nightmares and tantrums. But by the time of the report, those behaviors had subsided and N.H. had developed a strong bond with the foster family.

The report noted that mother had not completed the following components of her case plan: parenting education, domestic violence counseling, psychotropic medication evaluation and monitoring, substance abuse services, and random drug testing. Mother visited the children twice per week and had additional visits at the home of the maternal grandmother.

The Department assessed that the risk of returning N.H. to mother was high due to mother's substance abuse and domestic violence history, her relapses in December 2011 and February 2012, and her inadequate participation in case plan services. At the hearing on May 4, 2012, the juvenile court continued N.H. in her placement and set a 12-month review hearing for October 2012.

On May 15, 2012, the dependency drug court found that mother was noncompliant. The court set a compliance hearing for June 12, 2012. Mother failed to attend the compliance hearing, which was continued to June 19, 2012. At the continued hearing, the court found that mother was noncompliant.

The 12-month review report for N.H. noted that mother underwent a psychiatric assessment in May 2012. Her clothing was disheveled and unclean, she had an outward odor, and her speech was dysphoric. She appeared to be actively hallucinating and was diagnosed as suffering from a psychotic disorder. She refused to sign a release of information and declined to discuss the dependency matters with the evaluator. Although mother's Medi-Cal was active during her assessment period, mother failed to return to complete the assessment and her case was closed in July 2012.

On June 22, 2012, mother was discharged from a residential drug treatment program because she had used threatening language during a confrontation with a program peer. On July 3, 2012, mother failed to appear at a dependency drug court hearing. She was dismissed from the court for failure to participate. That same day, mother was arrested for public intoxication and jailed overnight. Prior to the arrest, mother had been in a physical altercation with her brother, the uncle of the children.

7

Mother failed to submit to urinalysis testing from July to mid-August 2012 and on two dates in August and September 2012. She tested negative on eight occasions in August and September 2012.

On October 4, 2012, mother's counsel requested an order requiring mother to participate in dependency drug court. But mother failed to appear at the hearing to consider the request and, as a result, the request was denied.

The review report recommended that mother's reunification services regarding N.H. be terminated. N.H. was calling her foster parents "mommy" and "daddy," her hair-pulling and nightmares had ceased, and her development was appropriate for her age group. Counsel for the children joined in the Department's recommendation that mother's reunification services be terminated.

The six-month review report for I.H. noted that at the beginning of his current foster placement, I.H. had tremors and would choke on his formula, hold his breath until he turned blue and awaken approximately four times per night. But by the time of the review, I.H. no longer choked or had tremors and would resume breathing before he turned blue. He was alert, happy, and was developing a strong bond with the foster family.

At an October 12, 2012 hearing, the juvenile court set a contested hearing for November 2012.

In a November 2012 addendum to the reports for both children, the Department noted that mother had not provided any documentation that she had received psychotropic medication monitoring or other mental health services. The Department was unable to confirm mother's participation in substance abuse services. The juvenile court confirmed contested hearings in both children's matters.

In December 2012, at a contested hearing for both children, the juvenile court found that mother had been offered reasonable services; there was not a substantial probability the children could be returned to her within six months; and mother's

progress in alleviating or mitigating the causes of the children's placements was fair. The juvenile court terminated mother's reunification services. When the hearing continued in January 2013, the court set a selection and implementation hearing for May 17, 2013.

E

In April 2013, mother filed a 388 petition, asking that both children be returned to her with supervision or, alternatively, that her reunification services be reinstated. The 388 petition was based on mother's active participation in outpatient substance abuse treatment, parenting classes, Narcotics Anonymous meetings, mental health services, and family relationship counseling. The 388 petition acknowledged that mother's participation in services had ceased due to the onset of gestational diabetes but claimed her participation would resume some time after May 2013. Father supported and ultimately joined in the 388 petition.

The selection and implementation report noted that mother recently had given birth to a baby girl.

N.H. and I.H. were in a foster home and the Department was hopeful an adoptive home would be found. The children were generally adoptable due to their young age, overall good health and lack of developmental, educational, or behavioral concerns. The caretaker was working with N.H. on socialization skills. For the most part, N.H. interacted appropriately with other children and she had a normal sibling relationship with I.H. The report described mother's interaction with the children during visitations as that of a "friendly visitor."

On June 4, 2013, the juvenile court heard evidence for the 388 petition and conducted the contested selection and implementation hearing. Mother was the only witness. She testified that, after reunification services were terminated, she began a substance abuse treatment program. The program was helpful because mother was learning to avoid people who encouraged substance abuse. She said she had not used drugs since September 30, 2012. Due to the difficult pregnancy and birth of her child,

9

mother's only substance abuse treatment was three Alcoholics Anonymous and Narcotics Anonymous meetings per week, plus drug testing.

Mother testified that she attended five or six individual counseling sessions. Mother and father attended a "Flourishing Families Program" that addressed communication between the parents and techniques for resolving differences and misunderstandings. Specifically, she learned to resolve differences through communication rather than by "fighting it out or lashing out." Because father speaks Spanish, they communicate using charades and a Spanish-English dictionary.

Mother testified that the last incident of domestic violence occurred when N.H. was removed. She said father was no longer controlling her. Father knew that "the people that [mother] used to hang around weren't so good people." He previously would advise her, "don't go hang around [with] that person," but she "never listened." By the time of the hearing, father had stopped trying to control mother's choice of associates. Mother added that she and father have lived together since October 2012. The couple married just weeks prior to the hearing.

Mother further testified that on March 26, 2013, she obtained a mental health assessment and was diagnosed with posttraumatic stress disorder and anxiety. She met with a psychiatrist on May 9, 2013, and started taking medications the next day. She felt "more clear headed" and had fewer panic attacks and less anxiety. Mother did not know whether she was to have regular follow-up appointments. She was in the process of arranging for mental health group counseling. She said that, after she completed drug rehabilitation in March 2011, she maintained sobriety for eight or nine months before relapsing at the time of I.H.'s birth. Mother acknowledged that she previously completed domestic violence classes in September 2012 and parenting classes in October 2012. She did not know that she was supposed to inform the social worker when she and father resumed their relationship in September 2012 and when they began living together in October 2012. Mother described the prior domestic violence as mutual. She predicted

10

there would be no more domestic violence because father stopped drinking and she stopped using drugs.

Mother added that she and father had attended 12-step meetings in October, November, and December 2012, although they did not obtain proof of attendance. Her safety plan in the event of domestic violence was to leave. She said the July 2012 domestic violence incident with her brother occurred while they were "socially drinking." Mother's radio was too loud so the brother turned down the volume; then he "beat the hell out of" mother.

The juvenile court ruled on the 388 petition on June 5, 2013. It said mother needed to address three sets of issues: mental health, substance abuse and domestic violence.

Turning first to substance abuse, the juvenile court noted that mother was in a program at Strategies for Change. She started on February 1, 2013, and was due to graduate on August 1, 2013, or possibly later because she had missed a portion of the program during her pregnancy disability. In short, mother had participated in the program for about three months.

As for mental health, the juvenile court noted mother's testimony that she had just begun medication in early to mid-May 2013. She "literally has just begun to see if this medication will work, won't work. It's too early to tell."

Regarding domestic violence, the juvenile court noted that mother completed a course in domestic violence "but immediately if not even before she completed it she got back together with the father." The juvenile court said getting back together with her abuser undermined mother's claim that she understood and was dealing with domestic violence. The juvenile court acknowledged that the parents had taken a communication course but opined that the course was "not about domestic violence," which involves "issues of power and control and red flags and how to avoid domestic violence, safety plans." The juvenile court said the communication course did not address those issues.

11

The juvenile court concluded: "the circumstances are changing, and I don't want to diminish or minimize what the parents have done. I mean the mother has signed up for a class to deal with her substance abuse. She has finally begun to deal with her mental health issues, but in the context of this motion she has just begun. The circumstances I cannot yet conclude have changed. Changing, yes, but not changed."

The juvenile court said even if mother's circumstances had changed, returning the children was not in their best interests because without a track record, there was no way to predict whether mother would be successful in addressing substance abuse. Similarly, regarding mental health, the juvenile court said mother had just begun treatment. The juvenile court thought mother had not really addressed the domestic violence given her relationship with father. Finally, the juvenile court noted that mother had no remaining time for reunification with N.H. and only two months for reunification with I.H., and that was not enough time to address the significant and longstanding problems. The juvenile court denied the 388 petition.

## DISCUSSION

### I

The Department claims mother and father failed to pursue their appeal of the order denying mother's 388 petition. Mother and father, acting in propria persona, checked box 7b, "Section 366.26," and its subsidiary box, "Termination of parental rights," while leaving unchecked box 7d, "Other appealable orders relating to dependency (specify)." In the Department's view, the parents should have checked box 7d to specify an appeal from the order denying mother's section 388 motion. The Department argues the parents' failure to check and complete box 7d, and their subsequent failure to raise any substantive issue other than the denial of the section 388 motion, "excludes them from any hearing by this court on the matter."

Mother and father submitted with the notices of appeal a two-page handwritten letter referencing their accomplishments in seeking to regain custody of their children.

12

The letter says the classes they attended are very helpful, mother and father "are very dedicated and sincere in recovery/sobriety," and they strongly believe they can be the best parents for their children. The letter does not expressly state that the parents are appealing from the denial of the section 388 motion, but the substance of the letter directly relates to the section 388 issue later addressed in mother's appellate brief, with which father joined.

The Department did not mention the letter from mother and father and did not address whether the letter, when read together with the notices of appeal, are still inadequate. But notices of appeal are entitled to liberal construction in favor of sufficiency. (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450.) Applying a liberal construction, we conclude the letter and notices of appeal are sufficient.

II

Mother contends the juvenile court abused its discretion in denying her 388 petition.

A parent may bring a petition for modification of any order of the juvenile court pursuant to section 388 based on new evidence or a showing of changed circumstances.[3] "The parent requesting the change of order has the burden of establishing that the change is justified. [Citation.] The standard of proof is a preponderance of the evidence. [Citation.]" (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.) Determination of a 388 petition is committed to the sound discretion of the juvenile court and, absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld.

_____

[3] Section 388 provides, in part: "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . . [¶] . . . [¶] . . . If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . recognition of a sibling relationship, [or] termination of jurisdiction, . . . the court shall order that a hearing be held . . . ."

(*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)  The best interests of the child are of paramount consideration when the 388 petition is brought after termination of reunification services.  (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.)  In assessing the best interests of the child, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability.  (*Ibid.; In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

"[T]he petitioner must show changed, not changing, circumstances.  [Citation.] The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.'  [Citation.]" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615-616, italics omitted.)

The juvenile court may consider "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children [and] *both* [the] parent and [the] caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*).)

Mother's appellate argument tracks the three *Kimberly F.* factors.  Regarding the first factor, mother acknowledges that the reasons for each child's dependency were "quite serious."

As for the second *Kimberly F.* factor, mother argues the children's bonds to the caretakers were not significant because they were not seeking adoption and no prospective adoptive home had been identified.  The juvenile court did not evaluate the relative strengths of the children's bonds to mother and the foster caretakers.  That could be because the caretakers are not prospective adoptive parents.  In any event, the juvenile court did not dispute that mother shared a bond with her children.  But mother's bond did not outweigh the other *Kimberly F.* factors or require granting the 388 petition.

14

Turning to the third *Kimberly F.* factor, mother claims her participation in services ameliorated the reasons for the dependency and demonstrated changed circumstances. She says she showed changes regarding her "substance abuse, history of violence with partners, and mental instability." We consider these points in turn.

Mother's most significant changed circumstance, "sobriety since September 30, 2012," preceded the June 5, 2013, hearing by less than nine months. In her testimony, mother admitted returning to drugs within months after completion of residential treatment. She said it was different this time, however, because she "hit rock bottom" and had been "on [her] deathbed." But mother's testimony does not establish her claim that, "[f]or the first time, she had a relapse prevention plan of behavior."

Although mother had been in a substance abuse program for about three months, she had struggled with her methamphetamine addiction for 13 years. She gave birth to I.H. with amphetamines and methamphetamine in his system. On that record, less than nine months of sobriety and just three months of drug treatment following termination of reunification services did not compel the juvenile court to find that mother had shown changed circumstances.

Regarding domestic violence, mother testified that she and father attended a "Flourishing Families Program" that addressed communication and techniques for resolving differences and misunderstandings. Mother said the program pertained to domestic violence because it taught couples to resolve differences through communication rather than by "fighting it out or lashing out." But the juvenile court found that the course was "not about domestic violence," which involves "issues of power and control and red flags and how to avoid domestic violence, safety plans. These are not the things that the communication class that the parents have taken addresses." Mother has not shown that the juvenile court's characterization of the communication class was incorrect.

15

The evidence of changed circumstances regarding mental health was also insufficient. Mother was diagnosed as psychotic in late May 2012. Her 388 petition included a notice of an upcoming counseling appointment. Mother testified that on March 26, 2013, she obtained a mental health assessment and was diagnosed with posttraumatic stress disorder and anxiety. She met with a psychiatrist on May 9, 2013, and started taking medications the next day. She felt "more clear headed" and had fewer panic attacks and less anxiety. By the time of the June 4, 2013, hearing, mother had been on these medications for less than a month. This record supports the juvenile court's comment that mother only recently began taking new medications and it was too early to assess the medications' effectiveness.

Mother also claims she established changed circumstances because she and father married and resided in a sober household ever since mother's sober date of September 30, 2012. In the juvenile court, mother claimed their cohabitation was slightly shorter -- since October 2012 -- and that they had married just weeks prior to the hearing. In any event, the recent marriage does not, without more, establish a significant change of circumstances. Mother's continued sobriety was problematic given her history of relapse. As for father, mother predicted that there would be no more domestic violence because father stopped drinking and she stopped using drugs. But the evidence that father had successfully addressed his alcohol problem was scant. Mother claimed that she and father attended substance abuse meetings in October, November, and December 2012 but admitted that she had no proof of attendance. There was no evidence that father subsequently completed an alcohol treatment program.

In sum, mother has not shown that the juvenile court abused its discretion on any of the factors set forth in *Kimberly F.*, *supra*, 56 Cal.App.4th at page 532. The juvenile court properly found circumstances that were changing but not changed. And even if mother's circumstances had changed, the change was not " 'of such significant nature

16

that it requires a setting aside or modification of the challenged prior order.' "
(*In re Mickel O., supra,* 197 Cal.App.4th at pp. 615-616.)

III

Father joined mother's contentions, arguing that if mother is successful on appeal, the judgment terminating father's parental rights must be reversed because I.H. would not be adoptable.[4] But because we have concluded the trial court did not abuse its discretion in denying mother's 388 petition, father is not entitled to reversal of the judgment.

DISPOSITION

The order denying mother's 388 petition, and the order terminating mother's parental rights, are both affirmed. In addition, the order terminating father's parental rights is affirmed.

      MAURO      , J.

We concur:

      NICHOLSON      , Acting P. J.

      ROBIE      , J.

---

[4] We reject the Department's suggestion that father forfeited his claim by making only a general objection to the termination of his parental rights. Father had no occasion to assert his present objection in the juvenile court, an objection based on the argument that I.H. would not be adoptable if mother's order is reversed on appeal.

17